UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JEANNIE K. FRAME,                        )
                                         )
                    Plaintiff,           )
                                         )
            vs.                          )          Cause No. 1:11-cv-01062-WTL-MJD
                                         )
MICHAEL ASTRUE,                          )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

## ENTRY ON JUDICIAL REVIEW

Plaintiff Jeannie K. Frame requests judicial review of the final decision of Defendant

Michael Astrue, Commissioner of the Social Security Administration ("Commissioner"),

denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("the Act"). The Court now rules as follows.

## I.    SUBSTANTIVE BACKGROUND

### A.  Medical Records

Before Frame filed for disability benefits in April 2008, she had worked as a secretary, a

dietary aide, and karaoke singer/DJ. However, by the age of forty-three, she had developed

fibromyalgia, depression, diabetes, asthma, osteoporosis, and degenerative disc disease. As a

result of these illnesses, Frame alleges that she is disabled as of March 2, 2006. Portions of her

relevant medical records follow.

On April 27, 2004, Frame visited Hendricks County Immediate Care Center for right

shoulder pain after falling backward on her arm. At that time, she complained of popping, pain,

decreased range of motion, and numbness in her right shoulder. X-rays were negative. She was

subsequently prescribed Vioxx, fitted for a sling, and given a work excuse restricting her to left-handed work.

Frame returned on April 30 for a follow-up. At that time, she complained of continuing right shoulder pain but stated that her shoulder was "slightly better" and her range of motion was improved. She was prescribed Vicodin and given a note telling her she could return to work on May 5, 2004. On May 11, 2004, when her pain did not diminish and she exhibited clinical signs, she was referred to an orthopedist.

Frame returned to Hendricks Regional Immediate Care Center on August 18, 2005, complaining of left hip pain. The treating doctor noted that Frame had been involved in a car accident fifteen years earlier. Frame also reported that she had previously made routine visits to Dr. Halsted for pain, but she had not visited him in some time. The doctor diagnosed her with lower back pain and sacroiliac bursitis and prescribed Vicodin.

Frame visited Hendricks Regional Immediate Care on February 26, 2008, complaining of shortness of breath, wheezing, cough, chest tightening, daily weakness, and lower back pain. The examiner noted decreased range of motion and muscle spasms in Frame's back. Frame was diagnosed with depression, lumbar strain, and thrush, a rash on the inside of her mouth from some antibiotics she was taking. She was prescribed Cipro, an antibiotic, at discharge.

On March 5, 2008, Frame visited Dr. Michelle Oakerson, a primary care physician, complaining of depression, back pain, and a torn rotator cuff. Dr. Oakerson advised Frame to start Cymbalta and return in four weeks.

Frame sought treatment at the emergency room of Hendricks Regional Health on April 2, 2008, for evaluation of lower back pain. The previous night she turned over in bed and heard a pop. She noted the pain was sharp and radiating to her left buttocks and she had difficulty

bearing weight. On examination, the ER doctor noted her gait was normal and she was neurologically intact. Lumbar spine x-rays were negative. The staff first administered Lortab for pain. An hour later, they gave Frame an injection of Dilaudid. Once the pain diminished, they sent her home with instructions to follow up with Dr. Oakerson as soon as possible.

Frame returned to Dr. Oakerson on April 7, 2008, with continued complaints of back, hip, and leg pain. She also reported dyspnea and wheezing, due "to several episodes of severe broncho spasm with waking and gasping." Dr. Oakerson diagnosed fibromyalgia and suggested Frame increase her dose of Hydrocodone and begin taking Lyrica. Dr. Oakerson also assessed probable obstructive sleep apnea and depression.

Frame returned to Dr. Oakerson on May 21, 2008. At that time, she complained about an adverse reaction to Lyrica. Frame discontinued Lyrica after she experienced dizziness, slurred speech, and blurry vision. Dr. Oakerson noted she continued to complain of low back pain.

At the request of the Indiana Disability Determination Bureau, Frame attended a mental status examination ("MSE") with Dr. Roger Perry on July 8, 2008. At this interview, Dr. Perry noted times during the exam when Frame was anxious and tearful as she reported parts of her history and background. Otherwise, Dr. Perry noted she did not complain about memory problems, her thought process revealed no psychosis or paranoia, and she displayed no difficulty with abstract reasoning. Frame told Dr. Perry that her doctor prescribed Lexapro for bi-polar disorder. Dr. Perry diagnosed Cyclothymic Disorder, Adjustment Disorder, and assigned a GAF of 60.

The Indiana Disability Determination Bureau also requested Frame attend a physical consultative evaluation by Dr. Paul Glass. Frame attended the exam on July 10, 2008. At that time, she reported pain due to fibromyalgia, osteoporosis, degenerative disc disease affecting her

lower back pain, and limitations due to asthma. On examination, Dr. Glass noted she had no abnormalities in her hands and she had normal strength and sensory perception, but she exhibited tenderness along her lumbosacral spine. Frame declined to walk on her heels or toes or rise from a squatting position because of the low back pain. Dr. Glass assessed asthma, nicotine abuse, osteoporosis, degenerative disc disease with the low back pain syndrome, depression, and fibromyalgia. Dr. Glass noted that it was "impossible for this examiner to document or authenticate claimant's alleged lack of employability due to chronic fatigue and depression."

On July 22, 2008, Dr. Kenneth Neville completed a Psychiatric Review Technique Form indicating Frame's psychiatric conditions were "Not severe." He evaluated her under Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders) and indicated she had "Mild" difficulties in her activities of daily living, her ability to maintain concentration, persistence, or pace, and her ability to maintain social functioning. Dr. Neville noted her performance at the MSE with Dr. Perry and third-party reports indicating daily functioning limitations were due to pain and the side effects of medications she took. He observed: "She does well with conversations, depending on pain, and the medications that she's taken" and needs to "take frequent breaks . . . because of physical pain." He noted she avoided leaving the house alone and no longer drove due to her medications.

Frame continued treatment at the clinic an Hendricks Regional Health, called the Partners in Care/Primary Clinic. After an examination by Carolyn Harris, a Family Nurse Practitioner, on July 1, 2008, Frame was referred for an MRI of her lumbar spine. At the examination by Nurse Harris, Frame had a positive straight leg raising test and was tender to palpitation. Nurse Harris noted the presence of bursitis of the hips, left greater than right. She diagnosed depression, low back pain, and carpal tunnel.

An MRI was performed at Hendricks Regional Health on July 14, 2008, and revealed a normal lumbar spine with a "small left sided herniated" disc at T11-T12.

Frame returned to the clinic on July 30, 2008. Nurse Harris reviewed the findings of her x-ray and referred her to Dr. Steven Ward for pain management and physical therapy.

On July 31, 2008, state agency physician Dr. B. Whitley completed a Case Analysis form indicating Frame's conditions were "not severe." A second state agency physician affirmed that decision on October 8, 2008.

On August 5, 2008, Frame visited Dr. Ward. At that time, she complained of low back and left hip pain with pain radiating down her left side. On examination, Dr. Ward noted tenderness over her left sided S1 joint and left hip bursa. She had a negative straight leg raising test with good range of motion and normal strength in her extremities. Dr. Ward performed a left sacroiliac joint block. Dr. Ward diagnosed left lower back and hip pain secondary to left hip bursitis.

Frame saw Nurse Harris on October 28, 2008. At that time, she complained of depression and fatigue with difficulty sleeping. Harris prescribed new medications to deal with the pain and depression.

Frame returned to Dr. Ward on November 11, 2008. She reported the injection had helped with her pain in her hip, but that the back pain remained constant. On examination, she continued to display tenderness in her lower back. Dr. Ward performed a second injection and suggested a series of joint blocks to determine the origins of her back pain.

On November 19, 2008, Frame saw Nurse Harris again. At that time, she complained that the new medication caused shaking and sweating. Frame noted no change to her pain and depression and told Harris the injections had not helped.

Frame followed up with Dr. Ward on December 22, 2008. Dr. Ward reviewed her history: pain in her lower back and bilateral hips, which pain began after a car accident in the 1990s, three previous injections and joint blocks, and a lack of efficacy of this treatment. On physical examination, he noted Frame still had "severe tenderness" along her bilateral sacroiliac joints with negative straight leg raising tests with intact sensation and reflexes. He provided her an exercise program to mimic a course of physical therapy. He noted she would have to do this on her own, since she had no insurance.

On May 6, 2009, Frame reported to Nurse Harris that the injections had helped with some of the pain, but the hip pain remained and it "hurts all the time." Frame noted she could not sit in a recliner or bend over due to hip pain. An x-ray of her hips performed that day at the nurse's request was unremarkable.

On June 19, 2009, Harris ordered x-rays of Frame's shoulders to determine the cause of Frame's consistent complaints of shoulder pain. The x-rays revealed degenerative joint disease of acromioclavicular joint on the right and "mild left AC joint osteoarthritis" on the left. Also on June 19, Frame underwent a brain MRI to assess possible causes of her vertigo with memory loss and fatigue. The MRI revealed no significant intracranial pathology.

Frame visited Harris again on July 15, 2009, complaining that she was "unable to bend over without pain." Harris assessed her with acute low back pain, a positive straight leg raising test, and pain with palpitation over the lumbar spine.

Frame visited a new primary care physician, Dr. Ray Howell, on February 20, 2009, for her chronic pain. Dr. Howell assessed chronic pain syndrome, fibromyalgia, shoulder bursitis, tobacco use, and carpal tunnel syndrome. He prescribed Norco, Klonopin, and Wellbutrin, and referred Frame for an orthopedic consultation. Frame followed-up with Dr. Howell three times

through January 2010 for similar problems and other complaints, such as anxiety, restless leg syndrome, and rheumatoid arthritis.

Nurse Harris referred Frame for a neurology consultation on August 11, 2009, secondary to vertigo, memory loss, fatigue, increased generalized pain, and frequent falls over the prior four months. She noted Frame also had a history of fibromyalgia, depression, and chronic back and joint pain.

Frame began treating with neurologist Dr. Jesse Li on August 24, 2009. At that time, she complained of dizziness over the past three years, worsening memory loss over the past year, intermittent bilateral hand and leg numbness, bilateral hand tremors, and falls. On examination, Dr. Li noted tenderness in Frame's lower back, but range of motion was normal. He reported she was neurologically intact, but did have "bilateral fine tremors." He ordered a lumbar spine MRI and an ENG. The L-spine MRI showed a slight increase in size of the left paracentral herniated disc at T11-12 without mass effect on the cord and minimal disc bulging at L4-5 with mild bilateral foraminal narrowing. The ENG was performed on August 31, 2009, and was normal.

On returning to Dr. Li's office on September 10, 2009, Frame reported leg pain, memory problems and dizziness. Dr. Li felt the dizziness was related to medication side effects. His physical exam revealed no changes from his earlier exams. He assessed Frame's dizziness as a combination of medications she was taking, six of which affected the central nervous system. He noted low back pain and possible fibromyalgia.

Nurse Harris completed a medical questionnaire regarding Frame's impairments on April 11, 2010. She reported that she had treated Frame for depression, osteoarthritis, asthma, GERD, fibromyalgia, allergic rhinitis, insomnia, chronic back pain, bilateral hip pain, fatigue, tobacco use, and carpal tunnel syndrome. Harris noted that she had last treated Frame on July 21,

2009, and thus rated her ability to confidently speak about Frame's condition as "unknown." Harris noted Frame's medication regimen produced increased fatigue and GI distress. When prompted to describe any limits to Frame's everyday activities, Harris noted that fibromyalgia symptoms would come and go, but during a flare-up of fibromyalgia, Frame would have generalized body pain and weakness, making it hard to do anything but "sit or sleep." She noted that since she had treated her, Frame had been "unable to maintain continuous employment due to fibromyalgia and therefore experiences more financial hardship and stressors which worsen her depression and mental well being."

The next week, on August 9, 2010, Frame returned to Dr. Li. She told Dr. Li about her tremors, how she felt they were becoming progressively worse, and she feared she had Parkinson's disease. Dr. Li noted, again, the presence of fine tremors and advised her to return after an EMG.

On August 11, 2010, Frame returned to Dr. Li to discuss the EMG results. Dr. Li explained the EMG was normal. His examination impressions were unchanged. He started her on a trial of Sinemet, a Parkinson's medication. He then adjusted these medications when she returned on August 25. At this August 25 visit, Dr. Li found tender points in Frame's back but noted normal spinal range of motion and also noted "bilateral fine tremors" but normal coordination and hand function.

On August 27, 2010, Dr. Li completed a Physical Residual Functional Capacity Form. He noted he had seen her five times over the last twelve months. He diagnosed fibromyalgia and described her symptoms as back pain, leg pain, tremor, and numbness. Dr. Li expected her only severe side effect from her medications would be drowsiness and that her psychological conditions affected her ability to function. He felt she could sit for two hours without a break and

stand for thirty minutes and estimated she could sit for six hours in an eight hour day. He

admitted that he did not test her ability to stand/walk and, thus, had no opinion. Due to her

stiffness and pain, Dr. Li felt Frame would need a two-minute break to walk every thirty minutes

and she would need to be able to change positions at will. Additionally, she would need

unscheduled breaks of one to five minutes every one to two hours. Dr. Li opined she could lift

ten pounds frequently, twenty pounds occasionally, and fifty pounds rarely, and added that she

would have good days and bad days, but the numbers of these days was unpredictable. He opined

that Frame could perform most postural changes (stoop, bend, crouch, squat) occasionally. Dr. Li

indicated that Frame had no significant limitations with reaching, handling, or fingering.

### B.       Hearing Testimony

At the hearing, Frame testified to needing a cane infrequently when her fibromyalgia

flared up. She also described limitations in writing, her diminished ability to wash dishes and

hold cups due to hand tremors, and problems lifting ten to fifteen pounds. She noted performing

activities with frequent breaks and with help. She explained that Dr. Li had recently placed her

on a Parkinson's medication to help with her tremors. When asked by counsel and the ALJ why

she could not perform her last job as a singer/DJ, Frame explained that bending to pick up CDs

and carrying equipment proved too strenuous for her. She testified to frequent, almost daily,

flare-ups of fibromyalgia.

Dr. Lee Fisher also testified at the hearing as a medical expert. Dr. Fisher testified that

Frame's severe impairments were "fibromyalgia, osteoporosis, low back pain, lumbar

degenerative disc disease, asthma, osteoarthritis in both shoulders, and gastroesophageal reflux

disease. In his opinion, Frame should be able to "lift and carry occasionally 20 pounds,

frequently 10 pounds. Sit, stand and walk two hours at any one time and through an eight hour

day, she could sit, stand and walk some combination of at least six hours each." He added that

she would be able to bend, crouch, crawl, squat, and stoop occasionally and she would have no

gross or fine manipulative limitations. However, she should never climb ropes or scaffolds.

When specifically asked about Frame's tremors, Dr. Fisher opined that "[i]t's certainly not in the

medical records because she even said it's only been . . . she's noticed it for three years, but she

just is having it worked up. It could be either – probably benign essential tremor . . . as opposed

to Parkinson's." After questioning by Frame's counsel, who noted the exhibit and page number

where "bilateral hand tremors" were diagnosed, Dr. Fisher reiterated that he did not think there

should be any functional limitation. He also confirmed that the medication Frame was taking was

for Parkinson's disease. Lastly, Dr. Fisher testified that Frame could sustain this set of

limitations for forty hours a week on a consistent basis.

      The vocational expert, Constance Brown, then testified. Brown noted that Frame's past

relevant work was as a singer, as a secretary, and as a dietary aide. When the ALJ asked her to

consider Dr. Fisher's limitations and whether a person with those limitations could return to her

past work, Brown said that such a person should be able to do so. On cross examination, Brown

indicated that secretarial work would be precluded by a limitation in fine fingering. Frame's

counsel concluded with a closing statement where he noted that this was less of a "grid rule"

case than a sustainability case.

## II.    **PROCEDURAL BACKGROUND**

      Frame filed for DIB on April 5, 2008, alleging a disability onset date of March 2, 2006,

due to fibromyalgia, depression, diabetes, asthma, osteoporosis, and degenerative disc disease.

Frame's application was denied initially on August 1, 2008, and again upon reconsideration on

October 9, 2008. Following the denial upon reconsideration, Frame requested and received a

hearing in front of an Administrative Law Judge ("ALJ"). A hearing, during which Frame was

represented, was held in front of ALJ John H. Metz on August 23, 2010. ALJ Metz issued his

decision denying Frame's application on December 2, 2010. The Appeals Council denied a

request for review on June 2, 2011, after which Frame filed this timely appeal.

### III.   APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by

reason of a medically determinable mental or physical impairment which can be expected to

result in death, or which has lasted or can be expected to last for a continuous period of at least

twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must

demonstrate that her physical or mental limitations prevent her from doing not only her previous

work, but any other kind of gainful employment that exists in the national economy, considering

her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step

sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is

not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step

two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her

ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step

three, the Commissioner determines whether the claimant's impairment or combination of

impairments meets or medically equals any impairment that appears in the Listing of

Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-

month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At

step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R.

§ 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

On review of the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into his reasoning . . . [and] build an accurate and logical bridge from the evidence to his conclusion." *Id.*

## IV.    THE ALJ'S DECISION

Applying the five-step analysis, the ALJ found that Frame was not disabled from March 2, 2006, through the date of his decision. At step one of the analysis, the ALJ found that Frame had engaged in substantial gainful activity ("SGA") from February 1, 2007, to June 2007. However, the ALJ found that there had been a continuous twelve-month period during which Frame did not engage in SGA, and the ALJ accordingly addressed his findings to the period during which Frame did not engage in SGA.

At step two, the ALJ determined that Frame suffered from the following severe impairments: fibromyalgia, degenerative disc disease, asthma, and arthritis in the shoulders. The ALJ further found that Frame's mental impairments of cyclothymia disorder and adjustment disorder with mild anxiety/depression were not severe.

At step three of the analysis, the ALJ determined that none of Frame's severe impairments met or medically equaled a listed impairment.

At step four, the ALJ concluded that Frame had the residual functional capacity ("RFC") to perform light work with the following restrictions: sit/stand/walk for six of eight hours; lift/carry, push/pull ten pounds frequently and twenty pounds occasionally; occasional bending, stooping, kneeling, climbing stairs and ramps, no climbing rope/ladder/scaffolds.

The ALJ concluded that, given Frame's RFC, she was able to perform her past relevant work as a singer and a secretary. Therefore, the ALJ determined at step five that Frame was not disabled.

## V.    DISCUSSION

### A.    Medical Source Analysis

Frame contends that the ALJ's RFC is erroneous because the ALJ improperly rejected Dr. Li's suggested functional limitations." The Commissioner points out, however, that the ALJ's ultimate RFC determination is substantially the same as Dr. Li's proscribed restrictions. The Court finds that the ALJ did err when he rejected Dr. Li's findings on the basis he articulated. Furthermore, portions of Dr. Li's functional limitations that are highly relevant to the analysis of whether Frame could sustain a full-time job were omitted without explanation by the ALJ. The Court therefore finds that the ALJ's erroneous rejection of Dr. Li's opinion was not harmless error.

The ALJ characterizes Dr. Li's functional limitations as indicating that Frame "was not even capable of sedentary work," which limitations the ALJ then rejects because he finds them "hardly consistent with objective testing, clinical findings and the claimant's own reports." On close examination of Dr. Li's report, however, one is hard-pressed to find support for this characterization.[1]

Sedentary work is characterized as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles." 20 C.F.R. § 404.1567(a). Such work "involves sitting, [and] a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally." 20 C.F.R. § 404.1567(a). "Occasionally" is defined as "occurring from very little up to one-third of the time. . . . [P]eriods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10.

Here, Dr. Li opined that Frame could sit for two hours before needing to get up and could stand for thirty minutes at one time before needing to sit down or walk around. While the doctor indicated that he had not tested Frame's ability to stand or walk, he indicated that she could sit at least six hours in a work day. She also required the ability to walk for two minutes approximately every thirty minutes. Given these restrictions, the Court finds that the ALJ's rejection of Dr. Li's opinion – on the basis that the doctor's opinion that Frame is "not even capable of sedentary

_____

[1]       The Court notes that this is not the only instance in which the ALJ seems to put his own spin on things. Other curiosities include the ALJ's assertion that Frame gets along well with her ex-husband when she testified at the hearing that she is a widow; the ALJ's stretched interpretation of Frame's statement that she lives with her young adult sons into a statement that Frame receives financial help from relatives; and the ALJ's statement that Frame's statement to Dr. Peny that she did little around the house was in "total conflict with her other reports indicating a wide range of physical and mental activities," when Frame's records clearly reveal consistency with Dr. Peny's reports.

work" is inconsistent with medical evidence – is not supported by substantial evidence in the record.

It is true, however, that the ALJ's RFC incorporates many of the restrictions Dr. Li indicated. As a result, the Commissioner argues, Frame "was not prejudiced by the ALJ's lack of explicit mention of this evidence." The Court disagrees.

An RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting. . . . 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p(1). Here, the ALJ and Dr. Li indeed agree that Frame can perform light work with the following restrictions: "sit/stand/walk for six of eight hours; lift/carry, push/pull ten pounds frequently and twenty pounds occasionally; occasional bending, stooping, kneeling, climbing stairs and ramps, no climbing rope/ladder/scaffolds." However, the ALJ does not include Dr. Li's further restrictions regarding the frequency with which Frame must take walking breaks (once every thirty minutes), the necessity of Frame taking unscheduled breaks (every one to two hours), and, most importantly, the fact that she will have "bad days" that will require her absence from work at an "unpredictable" rate. These factors are highly relevant to the analysis of whether Frame can sustain the RFC the ALJ assigned her. As the ALJ appears to have rejected these additional restrictions on an unsupported basis, the ALJ's ultimate RFC determination is less than complete. Likewise, as the hypothetical question the ALJ posed to the VE did not include these restrictions, the VE's testimony is also potentially incomplete. For this reason, the Court finds that the case must be remanded to the ALJ for thorough and accurate weighing of Dr. Li's opinion.

In addition, Frame argues that the ALJ erred when he rejected Dr. Li's opinion on the basis that it was unsupported by the evidence of record, but fails to cite any contrary evidence.

The Court agrees. On remand, if the ALJ rejects portions of certain medical opinions on the basis that they are unsupported, the ALJ should cite to specific visits, findings, or statements that contradict the findings he is rejecting.

Frame also asserts that it was error for the ALJ to "reject" Nurse Harris's opinions given the "the non-controlling weight of a secondary medical source." In response, the Commissioner asserts that the ALJ did not "reject" Nurse Harris's opinion. In fact, according to the Commissioner, the ALJ considered the nurse's opinion and agreed with it – "this is why he found that [Frame's] fibromyalgia was a severe impairment . . . while rejecting the opinions of the state agency physicians that [Frame] did not have a severe impairment."

Frame's assertion is apt. While the ALJ does find Frame's fibromyalgia to be severe, he rejects Harris' reports that "fibromyalgia flare-ups made it difficult to do any activity and she was unable to maintain continued employment" when he assigns Frame an RFC for light work with some restrictions. The question, then, is whether it was error for the ALJ to do so.

The Social Security Administration distinguishes between medical evidence from "acceptable medical sources" and other sources. "Acceptable medical sources" are generally licensed physicians, while other sources include nurse practitioners and physician assistants. SSR 06-03p. "Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p. While the regulations provide specific criteria – examining relationship and treating relationship, for example – for evaluating medical opinions from acceptable medical sources, they do not explicitly address how to

consider medical evidence from other sources. While at least one court has suggested that other medical source evidence should be evaluated using the same factors as acceptable medical sources, *Cruse v. Comm'r of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007), *cited with approval in Phillips v. Astrue*, 413 Fed. Appx. 878, 884 (7th Cir. 2010), at a minimum, this much is clear: given the importance and relevance of the information reflected in records authored by other medical sources, the ALJ must articulate a reasonable basis for rejecting other medical source opinions, which basis is grounded in substantive evidence in the record.[2]

Here, the ALJ failed even that simple test, as he rejected Nurse Harris's opinion as to Frame's limitations on the sole basis that Nurse Harris qualifies only as an "other medical source." Because the ALJ rejected Nurse Harris's opinion on an insufficient basis, his RFC is not fully informed. This is yet another reason that the ALJ's RFC determination must be reversed and remanded.

### B.    Credibility Determination

Frame also argues that the ALJ failed to properly evaluate her credibility, which in turn contributed further to his flawed RFC determination.

An ALJ's assessment of the claimant's credibility is entitled to special deference and is not grounds for reversal and remand unless it is "patently wrong." *E.g.*, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). However, in assessing the credibility of the claimant, the ALJ must articulate the reasons for his decision in such a way as to "make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the

---

[2]    For example, as the Commissioner points out in his brief, Nurse Harris qualified her opinion herself when she indicated that her level of confidence in her own report was "unknown." Nonetheless, relying on this fact to support the ALJ's decision at this stage is prohibited post hoc rationalization.

reasons for that weight." *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (citing SSR 96-7p).

Initially, Frame contends that the ALJ's decision is perfunctory boilerplate because it includes a paragraph of oft-repeated language that the Seventh Circuit has taken issue with before. However, following this paragraph, the ALJ goes into significant detail as he analyzes and weighs Frame's hearing testimony against her medical records. It is this level of detail and analysis (aside from one fatal flaw, see below) that is required in order for a district court to properly assess an ALJ's reasoning. There is no error here simply because the ALJ included in his analysis one contested paragraph.

Frame takes issue with the ALJ's focus on statements that she was seeking part-time work as inconsistent with her asserted limitations. On this point, however, Frame's argument is strained and approaches nonsense. First, Frame argues that the ALJ uses this statement to "ruin [Frame's] entire testimony." However, the credibility portion of the ALJ's determination reflects a detailed analysis that weighs many factors; the ALJ in no way rests his credibility determination on this statement alone. Furthermore, Frame then criticizes the ALJ for not asking her why she was seeking part-time work and suggests that he should have asked her whether she thought she could work part-time. The answer to that question should be obvious – what reasonable person would seek part-time work while at the same time believing she could not sustain part-time work if she found it – and would add nothing to the ALJ's analysis. Given the supporting evidence in the record, it was not error for the ALJ to consider this fact in making his credibility determination and it was not error for him to press the issue further at the administrative hearing.

An additional error, according to Frame, is the ALJ's statement that there was no documentation of hand tremors, which statement the ALJ used as support for providing no gross or fine motor movement restrictions. The Commissioner admits that this statement is incorrect, yet then attempts to rationalize after-the-fact by asserting that Frame "ignores the more salient point that no doctor supported her allegations that her hand tremors caused any functional limitations." Even if true, the ALJ did not rely on this fact and instead relied on an erroneous assessment of the record.[3] For this reason, the ALJ's determination of Frame's RFC with respect to restrictions of gross and fine motor movements cannot stand.

Finally, there is one portion of the ALJ's opinion that is patently wrong. In concluding his credibility determination, the ALJ stated, "Also, despite the fact that she has emphysema and is aware of the consequences of smoking on all of her conditions, she continues to smoke excessively. Thus, she can hardly be considered a totally credible witness." The Court is at a loss to determine how Frame's admission that she smokes renders her testimony incredible. Smoking

---

[3]     In fact, the ALJ states that Frame "testified to no deficits in fine and gross motor movements," a statement clearly contradicted by this insensitive exchange between Frame and her attorney at the hearing:

Q.   Now, your house is in foreclosure. We know that from the exhibits in the file. Do you have an idea where you're going to be living?

A.   I have no idea.

. . . .

Q.   Now you described to me earlier that you had problems doing dishes?

A.   Yes.

Q.   What happens?

A.   I get pains in my hands and I end up having to drop the dish.

Q.   Have you broken dishes?

A.   Yes, several.

Q.   I guess that'll make moving easier then.

in spite of one's declining health may fairly be considered ill-advised or perhaps even self-

destructive; it certainly demonstrates the stranglehold of nicotine addiction, but it's not

dishonest.

## VI.    CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED and**

**REMANDED** for further proceedings consistent with this Entry.

SO ORDERED:   08/21/2012

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.